UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE BIG LOTS, INC. SHAREHOLDER LITIGATION | Case No. 2:12-cv-00445-MHW-NMK |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

William D. Kloss, Jr. (0040854)
John J. Kulewicz (0008376)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Attorneys for the Individual Defendants and Nominal Defendant Big Lots, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

SUMMARY OF PRINCIPAL ARGUMENTS PURSUANT TO C.M.P. E(1) AND L.R. 7.2 .... vi

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ....................................................................................... 3

ARGUMENT .......................................................................................................... 5

I.    PLAINTIFFS' ALLEGATIONS OF INSIDER TRADING FAIL TO STATE A CLAIM AND ARE INSUFFICIENT TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE. ................................................................................. 5

      A.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Based on Insider Trading. ............................................................................................ 5

            1.    Ohio Law Does Not Recognize a Claim for Breach of Fiduciary Duty Based on Insider Trading. ............................................................. 6

            2.    Plaintiffs Do Not Plausibly Allege Harm to the Company. ......................... 6

            3.    Plaintiffs Fail to Allege Facts Plausibly Suggesting that the Individual Defendants' Trades Were Based on Material, Nonpublic Information. ...... 8

      B.    Plaintiffs Have Failed to Demonstrate that Demand Would Have Been Futile Because They Fail to Plead Particularized Facts Showing that a Majority of Big Lots Directors Faces a Substantial Likelihood of Liability for Insider Trading or Is Otherwise Incapable of Exercising Business Judgment. ................. 14

            1.    The Directors' Board Activities Do Not Establish that They Cannot Exercise Business Judgment. ..................................................................... 16

            2.    Plaintiffs Have Not Shown that a Majority of Directors Faces a Substantial Likelihood of Liability for Breach of Fiduciary Duty Based on Insider Trading. ................................................................... 18

II.   PLAINTIFFS' ALLEGATIONS OF VIOLATIONS OF INTERNAL CODES OF CONDUCT FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE. .................................................................. 26

III.  PLAINTIFFS' ALLEGATIONS OF CORPORATE WASTE FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE. ................................................................................................ 27

IV.   PLAINTIFFS' ALLEGATIONS OF UNJUST ENRICHMENT FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE. ................................................................................................ 28

V.    PLAINTIFFS' ALLEGATIONS OF TRADE SECRET MISAPPROPRIATION FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE. ................................................................................. 29

i

Page

VI.     PLAINTIFFS' TRADE SECRETS CLAIM PREEMPTS THE OTHER CLAIMS. ........29

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc., 649 F. Supp. 2d
    702 (N.D. Ohio 2009) ..................................................................................... 30

Aronson v. Lewis, 473 A.2d 805 (Del. 1984) .................................................... 16, 17

Ashland, Inc. v. Oppenheimer & Co., 648 F.3d 461 (6th Cir. 2011) ......................... 5

Barsan v. Pioneer Sav. & Loan Co., 127 N.E.2d 614 (Ohio 1955) ........................... 6

Bell Atl. v. Twombly, 550 U.S. 544 (2007) ........................................................ 28

Brophy v. Cities Serv. Co., 70 A.2d 5 (Del. Ch. 1949) ........................................... 8

Brown v. Ferro Corp., 763 F.2d 798 (6th Cir. 1985) ......................................... 6, 26

Columbus Steel Castings Co. v. King Tool Co., No. 08AP-385, 2008 WL 5104786
    (Ohio Ct. App. Dec. 4, 2008) ...................................................................... 30

Combs v. Int'l Ins. Co., 354 F.3d 568 (6th Cir. 2004) ............................................ 6

Daisy Sys. Corp., v. Finegold, 1988 WL 166235 (N.D. Cal. Sept. 19, 1988) ............ 8

Davis v. DCB Fin. Corp., 259 F. Supp. 2d 664 (S.D. Ohio 2003) ....................... 6, 26

Diamond v. Oreamuno, 248 N.E.2d 910 (N.Y. 1969) ............................................. 8

Drage v. Proctor & Gamble, 694 N.E. 2d 479 (Ohio Ct. App. 1997) ........... 14, 15, 16

Freeman v. Decio, 584 F.2d 186 (7th Cir. 1978) ...................................... 7, 8, 28, 29

Ganino v. Citizens Utils. Co., 228 F.3d 154 (2d Cir. 2000) ..................................... 4

Grand Council of Ohio v. Owens, 620 N.E.2d 234 (Ohio Ct. App. 1993) ............... 15

Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003) ........................................... *passim*

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999) .......................... 12, 25

In re CNET Networks, Inc., 483 F. Supp. 2d 947 (N.D. Cal. 2007) ....................... 12

In re Coleco Sec. Litig., 591 F. Supp. 1488 (S.D.N.Y. 1984) ................................. 8

In re Cray, Inc., Deriv. Litig., 431 F. Supp. 2d 1114 (W.D. Wash. 2006) ............ 7, 8

iii

**Page(s)**

In re Ferro Corp. Deriv. Litig., 511 F.3d 611 (6th Cir. 2008) ............................... 15, 16, 17, 18

In re Goodyear Tire & Rubber Co. Deriv. Litig., No. 5:03CV2180, 2007 WL 43557
    (N.D. Ohio Jan. 5, 2007)........................................................................................*passim*

In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881 (8th Cir. 2002) ................................................. 24

In re Keithley Instruments, Inc., Deriv. Litig. (Keithley I), 599 F. Supp. 2d 875
    (N.D. Ohio 2009) .................................................................................... 7, 18, 19, 27

In re Keithley Instruments, Inc., Deriv. Litig. (Keithley II), 599 F. Supp. 2d 908
    (N.D. Ohio 2009) .................................................................................................... 15, 16

In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425 (D.N.J. 2000)............................... 25

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314 (3d Cir. 2002) ..................................................... 4

In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 617 F. Supp. 2d 700 (S.D. Ohio
    2009) ......................................................................................................................... 27

In re Oracle Corp. Deriv. Litig., 867 A.2d 904 (Del. Ch. 2004)........................................*passim*

In re ORFA Sec. Litig., 654 F. Supp. 1449 (D.N.J. 1987) ........................................................ 8

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991) ......................................................... 15

Konkol v. Diebold, Inc., 590 F.3d 390 (6th Cir. 2009) .......................................... 9, 10, 12, 20

McConnell v. Hunt Sports Enters., 725 N.E.2d 1193 (1999) ................................................... 6

Prodan v. Hemeyer, 610 N.E.2d 600 (Ohio Ct. App. 1992)..................................................... 7

Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. 2003).......................... 19

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000).......................................................... 12, 14, 25

Sawant v. Ramsey, 742 F. Supp. 2d 219 (D. Conn. 2010) ....................................................... 12

Schein v. Chasen, 313 So.2d 739 (Fl. 1975)............................................................................. 8

Shlensky v. Dorsey, 574 F.2d 131 (3d Cir. 1978) ................................................................... 26

Univ. Hosps. of Cleveland, Inc. v. Lynch, 772 N.E.2d 105 (Ohio 2002)................................. 28

<b>Page(s)</b>

**Statutes & Rules**

17 C.F.R. § 240.10b5-1 ................................................................................ 5

Fed. R. Civ. P. 12(b)(6) ........................................................................... 2, 5

Fed. R. Civ. P. 23.1 ......................................................................... *passim*

Ohio Rev. Code Ann. § 1333.67(A) ............................................................ 29

Ohio Rev. Code Ann. § 1701.59(E) ............................................................ 28

**Other Authorities**

19 Wright & Miller, Federal Practice and Procedure § 4507 ....................... 27

**SUMMARY OF PRINCIPAL ARGUMENTS PURSUANT TO C.M.P. E(1) AND L.R. 7.2**

Plaintiffs are three shareholders of Big Lots.  They purport to bring this action on behalf of Big Lots against 16 current or former Big Lots directors or officers (and against Big Lots itself as a nominal defendant).  Plaintiffs allege that, after the Company publicly announced certain earnings guidance and other financial information on March 2, 2012, the Individual Defendants sold Big Lots shares from March 6, 2012, to March 28, 2012.

Plaintiffs raise five derivative causes of action, not one of which has ever been recognized under Ohio law by any court.  Plaintiffs' causes of action are: breach of fiduciary duty based on insider trading (Count I), breach of fiduciary duty based on violations of Big Lots' internal codes of conduct (Count II), trade secret misappropriation based on insider trading (Count III), unjust enrichment based on insider trading (Count IV) and corporate waste based on share repurchases concurrent with insider trading (Count V).

Plaintiffs' vague and conclusory allegations of insider trading must be rejected for two independent reasons.  First, Plaintiffs fail to state a plausible claim under Fed. R. Civ. P. 12(b)(6).  Second, Plaintiffs fail to satisfy Fed. R. Civ. P. 23.1, which sets forth pleading standards for diversity cases where, as here, Plaintiffs purport to sue on behalf of the corporation.  Under substantive Ohio corporate law, the right to sue on behalf of the corporation belongs to the corporation's board of directors only; shareholders are never entitled to sue on behalf of a corporation unless they first demand that the board pursue the proposed litigation itself or show in their complaint that such demand would have been futile.  Drage v. Proctor & Gamble, 694 N.E. 2d 479, 482 (Ohio Ct. App. 1997).  Under Rule 23.1, shareholders who purport to sue derivatively but who have not made a demand on the board of directors—as Plaintiffs here have not—must allege "with particularity" the reasons why demand would have been futile.  Fed. R. Civ. P. 23.1.  But Plaintiffs have not pled particularized facts showing that a majority of the Big

vi

Lots Board members are incapable of exercising independent business judgment. In re Keithley Instr., Inc., Deriv. Litig. (Keithley II), 599 F. Supp. 2d 908, 919 (N.D. Ohio 2009). Plaintiffs' vague allegations do not come close to showing that the Board members' past activities show that they cannot exercise business judgment. Id. And Plaintiffs cannot show that the Board members face a "substantial likelihood of liability" on Plaintiffs' claims. Id. at 920.

Plaintiffs' insider trading allegations fail to state a claim for three reasons:

First, Plaintiffs' claim is unprecedented: "Ohio law does not recognize a derivative claim for insider trading." In re Goodyear Tire & Rubber Co. Deriv. Litig., No. 5:03CV2180, 2007 WL 43557, at *8 (N.D. Ohio Jan. 5, 2007). Defendants are not aware of any court that has ever recognized such a claim under Ohio law. This Court, sitting in diversity, should not invent new common law causes of action. See Combs v. Int'l Ins. Co., 354 F.3d 568, 577–78 (6th Cir. 2004).

Second, although derivative plaintiffs under Ohio law must show harm to the corporation itself rather than to shareholders, see Brown v. Ferro Corp., 763 F.2d 798, 802–03 (6th Cir. 1985) (citing Barsan v. Pioneer Sav. & Loan Co., 127 N.E.2d 614 (Ohio 1955)), numerous courts have held that insider trading—though it might harm shareholders generally— does not harm the corporation itself. See, e.g., Freeman v. Decio, 584 F.2d 186, 193–94 (7th Cir. 1978); In re Cray, Inc., Deriv. Litig., 431 F. Supp. 2d 1114, 1132–33 (W.D. Wash. 2006). To invent harm to the corporation stemming from Defendants' trades, Plaintiffs speculate that Big Lots might have repurchased shares from the Individual Defendants, but Plaintiffs fail to show any plausible link between the Company's repurchases and the Individual Defendants' trades.

Third, even if this Court were to draw upon the law of a different state to create a new Ohio derivative cause of action based on insider trading, Plaintiffs' allegations would still

not state a claim.  Under Delaware law, Plaintiffs would need to show that (1) at the time of their trades, each Individual Defendant knew nonpublic information about Big Lots' financial performance compared to the announced guidance; (2) such nonpublic information made it likely that Big Lots would "either outperform or underperform its projections in some markedly unexpected manner"; and (3) each Individual Defendant's trades were "motivated" by knowledge of the material, nonpublic information.  See In re Oracle Corp. Deriv. Litig., 867 A.2d 904, 934, 939–40 (Del. Ch. 2004).  Plaintiffs' allegations here fail each step of that test.

Plaintiffs have not shown that the Individual Defendants had nonpublic knowledge of Big Lots' actual mid-quarter financial performance at the time of their trades.  The Consolidated Complaint contains no plausible allegation suggesting when, how or from whom the Individual Defendants supposedly received information indicating that Big Lots would not meet its first quarter guidance.  See Konkol v. Diebold, Inc., 590 F.3d 390, 397 (6th Cir. 2009).

Plaintiffs have failed to allege that, at the time of each of the trades at issue, any deviation in performance from the announced guidance was actually material, let alone that any of the Individual Defendants had that knowledge.  Oracle, 867 A.2d at 939–40.  Plaintiffs allege only that, when the Individual Defendants sold their shares, they knew the guidance was "overstated", but there is no allegation whatsoever regarding what that means, or regarding any knowledge of the magnitude of any difference between the guidance and the Company's actual interim performance.

Plaintiffs have not demonstrated that any Individual Defendant's stock trades were actually motivated by any purported knowledge of material, nonpublic information.  See Oracle, 867 A.2d at 934, 954.  The full context of the Individual Defendants' stock sales shows that the timing and the amount of the trades are explained by "proper, non-suspicious financial

considerations".  See id. at 954.  For example, the Individual Defendants' sales were not unusual in timing.  On March 1, the day before the public statements at issue in this litigation, and again on March 6, when Defendants began selling their shares, Big Lots shares closed at a 14-year high, making Defendants' decisions to sell some of their holdings shortly thereafter both prudent and entirely understandable.  See Sawant v. Ramsey, 742 F. Supp. 2d 219, 232 (D. Conn. 2010) (finding no insider trading because, among other reasons, the defendant "sold at a time when Host's stock had reached unprecedented levels in both price and trading volume").

Nor have Plaintiffs demonstrated that the sales were suspiciously large.  See Konkol, 590 F.3d at 399.  Plaintiffs mischaracterize the Individual Defendants' trading histories and present a grossly misleading description of the significance of the March 2012 sales.  In fact, for several Defendants, the trades at issue represented their smallest-ever sales of Big Lots stock.

Similarly, Plaintiffs fail to show that the proceeds of the trades were large enough to serve as a motivation to engage in insider trading.  See Oracle, 867 A.2d at 954.  Although Plaintiffs allege the Individual Defendants each received certain proceeds from their sales, those alleged amounts are gross, not net.  The corrected amounts, which for some Defendants are under $100,000, do not remotely suggest insider trading.  See, e.g., Rothman v. Gregor, 220 F.3d 81, 95 (2d Cir. 2000).

In sum, Plaintiffs cannot allege facts that would plausibly satisfy each element of a newly created insider trading claim, and therefore Plaintiffs' claims should be dismissed.

In addition, Plaintiffs cannot show that five out of nine Big Lots Board members are incapable of exercising disinterested business judgment such that demand would be futile.  Plaintiffs allege that the director Defendants are not independent because they would not want to sue each other or because, for example, they serve on committees that award supposedly large

compensation packages, but such allegations are insufficient as a matter of law.  In re Goodyear, 2007 WL 43557, at *5; In re Ferro Corp. Deriv. Litig., 511 F.3d 611, 618–19 (6th Cir. 2008). Plaintiffs also allege that at least five directors face a substantial likelihood of liability for insider trading, but the facts show otherwise.  Two of the nine Board members are not accused of insider trading at all.  For three others, Plaintiffs do not allege with particularity that those Board members (who were each outside directors) were aware at the time of each of their trades that Big Lots' interim financial performance differed from the announced projections in a markedly unexpected manner.  See Guttman v. Huang, 823 A.2d 492, 502–04 (Del. Ch. 2003).  And those same outside directors' trades were not unusual in timing or amount—each sold his or her shares within days after Big Lots' shares hit a 14-year high, and the trades at issue were the smallest trades that each had ever made since becoming a director.  The other directors' trades also do not raise an inference that their trades were motivated by material, nonpublic information. Accordingly, at least five members on the Big Lots board do not face a substantial likelihood of liability and are not otherwise disqualified, and Plaintiffs' claims should be dismissed under Rule 23.1 for failure to show demand futility.

Plaintiffs' other claims fare no better.  Defendants are not aware of any court that has recognized a cause of action under Ohio law for alleged violations of a corporation's internal codes of conduct, unjust enrichment, trade secret misappropriation or corporate waste based on insider trading.  And because Plaintiffs fail to allege harm to the corporation, all those derivative claims must fail.  Because those allegations fail to state a claim, those allegations also fail to show a substantial likelihood of liability, and Plaintiffs' claims should be dismissed for failure to show demand futility.

## PRELIMINARY STATEMENT

The issue presented by this motion is whether the Court should permit Plaintiffs to bypass the Big Lots Board of Directors and, without justification, usurp the Board's governance responsibilities by asserting novel derivative claims that Ohio law has not previously recognized and that have no plausible basis.  For the reasons explained below, Plaintiffs' claims should be dismissed with prejudice.

Plaintiffs bring this action against seven current or former members of the Big Lots Board of Directors and nine non-director officers,[1] as well as the Company as a nominal defendant, alleging that within days of issuing earnings guidance for the first quarter of the 2012 fiscal year, those sixteen individuals supposedly knew Big Lots would not come close to meeting that guidance and decided to sell substantial portions of their Big Lots holdings.  (CC ¶ 2.) Plaintiffs assert state-law causes of action for breach of fiduciary duty, unjust enrichment, misappropriation of trade secrets and corporate waste.  (Id. ¶¶ 86–109.)

Plaintiffs do not bring these claims in their own right.  Instead, they purport to bring them derivatively—that is, to assert claims that would properly belong to Big Lots, on Big Lots' behalf.  However, Plaintiffs have no right to do so.  Contrary to the requirements of Ohio law and the pleading rules of Fed. R. Civ. P. 23.1, Plaintiffs have failed first to demand that the Company pursue those claims on its own behalf through its Board, and Plaintiffs have not pled with particularity facts showing that such a demand would have been futile because a majority of

---

[1] The directors named as defendants are Jeffrey Berger, David Kollat (whose retirement became effective two days after this lawsuit was filed), Brenda Lauderback, Philip Mallott, Russell Solt, Dennis Tishkoff (the "Outside Director Defendants") and CEO Steven Fishman (together with the Outside Director Defendants, the "Director Defendants").  In addition to Mr. Fishman, the Big Lots officers named as defendants are Robert Claxton, Joe Cooper, Charles W. Haubiel II, Timothy Johnson, John Martin, Norman Rankin, Paul Schroeder, Robert Segal and Steven Smart (the "Officer Defendants").

the Board members face a substantial likelihood of liability such that they should not be permitted to exercise their business judgment on behalf of the Company.  Not only do Plaintiffs' allegations fail to show a substantial likelihood of liability for any director (let alone a majority of them), Plaintiffs fail even to state viable causes of action under Ohio law, and therefore the Court should also dismiss the Consolidated Complaint under Fed. R. Civ. P. 12(b)(6).

First, because Plaintiffs purport to sue derivatively on behalf of the Company, Ohio law requires them to allege that Big Lots itself—as opposed to shareholders generally— was harmed by the alleged insider trading that is the gravamen of the Consolidated Complaint. However, courts around the country have consistently held that insider trading, though it might harm shareholders, does not harm the corporation.  For that reason, Ohio does not recognize a derivative cause of action for insider trading.  Although Plaintiffs assert in conclusory fashion that the Company was somehow harmed because it was repurchasing its own shares around the time of the trades at issue, Plaintiffs cannot point to any link whatsoever between the Company's repurchases and any alleged insider trades.  Accordingly, Plaintiffs have not shown any harm to the Company, and all their claims must fail for that reason alone.

Second, even assuming Plaintiffs are asserting cognizable legal theories—and they are not—Plaintiffs have not adequately pled particularized facts showing that Big Lots' directors faced a substantial likelihood of liability and that consequently demand on the Board would have been futile.  Plaintiffs support their accusations of insider trading by pointing to little more than the trades themselves, but Rule 23.1 requires more.  Plaintiffs point to no facts showing that any of the seven Director Defendants—six of whom are outside directors with no day-to-day management responsibility—had actual knowledge of the Company's interim financial performance or any deviation from the previously announced guidance at the time of

2

his or her stock trades.  Plaintiffs merely allege that the Director Defendants had "access" to the Company's financial information as a general matter.  But it is well-established that vague and conclusory allegations of that kind are insufficient as a matter of law to support a claim for insider trading.  Plaintiffs further allege no facts whatsoever to suggest that any difference in magnitude between the Company's financial projections and its actual financial performance less than a week after those projections were announced was material or that the trades at issue were unusual in timing or amount.  In fact, contrary to Plaintiffs' misleading assertions, the challenged stock sales were the smallest trades that several directors had ever made in Big Lots shares.

In sum, Plaintiffs' conclusory allegations do not state a plausible claim for insider trading, much less put forth particularized facts showing that a majority of the Board members faces a substantial likelihood of liability or is otherwise compromised such that three individual shareholders should be allowed to usurp the Board's right to direct the affairs of the Company.

## STATEMENT OF FACTS

Big Lots is a Fortune 500 retail company with headquarters in Columbus, Ohio. (CC ¶ 9.)  Big Lots sells "an assortment of merchandise, including consumables, seasonal products, furniture, housewares, toys and gifts."  (Id.)  Its shares are publicly traded on the New York Stock Exchange.  (Id.)  Big Lots is named as a nominal defendant; the Individual Defendants include six outside directors, one inside director (Big Lots' CEO, Steven Fishman), and nine officers who are not members of the Board.  (Id. ¶¶ 10–25.)

On Thursday, March 1, 2012, shares of Big Lots closed at $44.49.[2]  It was the highest closing price of Big Lots stock in nearly 15 years.[3]

---

[2] See Big Lots historical stock price data for January 30, 2012 through July 27, 2012, attached as Exhibit A to the Declaration of Brendon DeMay, dated September 10, 2012 ("DeMay Decl.").  Historical stock price data may be considered on a motion to dismiss because it is a

3

On Friday, March 2, 2012, Big Lots issued a press release with guidance for the full 2012 fiscal year and the first fiscal quarter.  (CC ¶ 29.)  The press release stated, among other things, that comparable store sales in the United States were expected to increase 2% to 3% compared to the previous year.  (Id. ¶ 30.)  Similar guidance was issued that day during a conference call with investors.  (Id. ¶ 31.)  Big Lots shares closed that day at $42.71, closed the following Monday at $44.15, and closed between $42.80 and $46.81 for the next seven weeks, at an average closing price of $44.88.[4]

On April 23, 2012, the Company issued revised first-quarter guidance, stating "we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance . . . .  U.S. comparable store sales were on plan through the first six weeks of the quarter; however, sales compared to plan began to slow in late March and trends have further softened as we moved through the month of April."  (CC ¶ 53.)  The next day, Big Lots shares closed at $34.71, down from a closing price of $45.71 the day before.  (Id. ¶ 54.)

On May 23, 2012, the Company issued a press release that, among other things, reported its first quarter results and announced revised guidance for the full fiscal year.  (Id. ¶ 61.)  Comparable U.S. store sales had decreased 0.8% for the quarter, and sales estimates for the full fiscal year were revised to be flat or at a 1% increase.  (Id.)  The press release also stated

---

matter of public record, is capable of ready and accurate determination, is not reasonably subject to dispute and is referred to in the Consolidated Complaint.  See, e.g., In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002); Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[3] See Big Lots historical stock price data for 1985 to the present (DeMay Decl. Ex. B).

[4] See DeMay Decl. Ex. A.  The average closing price weighted by daily volume is $44.55.

4

that, pursuant to a share buyback program instituted in 2011, Big Lots had repurchased

approximately $99 million worth of shares during the first quarter at an average price of $39.32.[5]

Between March 6, 2012, and March 12, 2012, the Outside Director Defendants

sold Big Lots stock at prices ranging from $43.57 to $45.39.  (CC ¶ 50.)  Between March 6 and

March 28, the Officer Directors sold Big Lots stock at prices ranging from $44.37 to $46.60.

(Id.)  Plaintiffs do not allege the cost basis for any of the shares that were sold.  Some of the sales

were simultaneous with exercises of Big Lots stock options.  (Id. ¶¶ 33–48.)  In addition, each of

the Officer Directors' sales on March 27 and March 28, including those of Mr. Fishman, were

pursuant to plans intended to comply with SEC Rule 10b5-1.[6]  (Id. ¶ 51.)

## ARGUMENT

I.  **PLAINTIFFS' ALLEGATIONS OF INSIDER TRADING FAIL TO STATE A
CLAIM AND ARE INSUFFICIENT TO DEMONSTRATE THAT DEMAND
WOULD HAVE BEEN FUTILE.**

    A.  **Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Based on
Insider Trading.**

When assessing the strength of a complaint under Rule 12(b)(6), courts must

accept all well-pled allegations as true, yet the complaint must allege facts that plausibly state a

claim, as opposed to facts that are merely consistent with liability.  See, e.g., Ashland, Inc. v.

Oppenheimer & Co., 648 F.3d 461, 467–68 (6th Cir. 2011).  Under that standard, Plaintiffs'

attempts to state a claim based on allegations of insider trading are defective.  First, Ohio law

does not recognize derivative claims for breach of fiduciary duty based on insider trading, and

this Court should not invent such a cause of action.  Second, derivative claims under Ohio law

---

[5] See Big Lots press release dated May 23, 2012, at p. 2 (DeMay Decl. Ex. C).

[6] Sales pursuant to Rule 10b5-1 plans are set in advance and do not permit "any subsequent influence over how, when, or whether to effect purchases or sales", thus avoiding the inference that the trades were based on inside information.  17 C.F.R. § 240.10b5-1.

require harm to the corporation, and Plaintiffs have not plausibly alleged that the Company was harmed by the Defendants' alleged conduct.  Third, Plaintiffs have not plausibly alleged that any Individual Defendant possessed material, nonpublic information at the time of his or her trades and that such trades were motivated by that information.

### 1. Ohio Law Does Not Recognize a Claim for Breach of Fiduciary Duty Based on Insider Trading.

Plaintiffs' allegations are legally insufficient for the simple reason that "Ohio law does not recognize a derivative claim for insider trading."  In re Goodyear Tire & Rubber Co. Deriv. Litig., No. 5:03CV2180, 2007 WL 43557, at *8 (N.D. Ohio Jan. 5, 2007).  Defendants are not aware of any court that has ever held that Ohio law recognizes a derivative cause of action for breach of fiduciary duty based on insider trading.  This federal Court, sitting in diversity and applying Ohio law, should not invent a new common law cause of action.  See Combs v. Int'l Ins. Co., 354 F.3d 568, 577–78 (6th Cir. 2004).

### 2. Plaintiffs Do Not Plausibly Allege Harm to the Company.

The little authority that does exist under Ohio corporate law shows that an Ohio court evaluating Plaintiffs' allegations would find them insufficient.  Ohio law requires plaintiffs in an action for breach of fiduciary duty to allege an injury that proximately results from the alleged breach.  Davis v. DCB Fin. Corp., 259 F. Supp. 2d 664, 673 (S.D. Ohio 2003) (citing McConnell v. Hunt Sports Enters., 725 N.E.2d 1193 (1999)).  Further, because this is a derivative action, Ohio law requires that such injury inure to the corporation itself rather than to shareholders or others.  See Brown v. Ferro Corp., 763 F.2d 798, 802–03 (6th Cir. 1985) (citing Barsan v. Pioneer Sav. & Loan Co., 127 N.E.2d 614 (Ohio 1955)).  In the absence of a showing of harm to the Company, there is no cognizable derivative claim under Ohio law.

6

First, as numerous courts across the country have held, insider trading—though it might harm shareholders generally—does not harm the corporation itself.  See, e.g., Freeman v. Decio, 584 F.2d 186, 193–94 (7th Cir. 1978); In re Cray, Inc., Deriv. Litig., 431 F. Supp. 2d 1114, 1132–33 (W.D. Wash. 2006).  As the Seventh Circuit has held, because insider trading is illegal, a corporation itself cannot legally trade on its own information (such as a yet-to-be-announced earnings decline).  Even when a corporate officer trades on inside information illegally, the corporation itself is not deprived of any valuable opportunity, and therefore the corporation does not suffer any damage:

> "If the corporation were to attempt to exploit such non-public information by dealing in its own securities, it would open itself up to potential liability under federal and state securities laws, just as do the insiders when they engage in insider trading. This is not to say that the corporation does not have any interests with regard to such information. It may have an interest in either preventing the information from becoming public or in regulating the timing of disclosure.  However, insider trading does not entail the disclosure of inside information, but rather its use in a manner in which the corporation itself is prohibited from exploiting it."  Freeman, 584 F.2d at 194.

Consequently, Plaintiffs' allegations of insider trading, even if true, are insufficient to show harm to Big Lots and thus cannot be a basis for a derivative claim.

Second, in a misconceived attempt to plead harm to the Company stemming from the Individual Defendants' trades, Plaintiffs allege that the Individual Defendants engaged in corporate waste[7] by "fail[ing] to implement any controls to prevent the Company from repurchasing shares from the Defendants".  (CC ¶ 106.)  Plaintiffs allege the Board "approved a

---

[7] While the doctrine of "corporate waste" articulates a way in which a director's fiduciary duty can be breached, it is not a cause of action independent of a fiduciary breach.  In re Keithley Instruments, Inc., Deriv. Litig., 599 F. Supp. 2d 875, 903 & n.25 (N.D. Ohio 2008); see In re Goodyear, 2007 WL 43557, at *8–9 (analyzing corporate waste allegation as a breach of fiduciary duty); Prodan v. Hemeyer, 610 N.E.2d 600, 603–04 (Ohio Ct. App. 1992) (same).

share repurchase program in 2011" and that "[i]n the first quarter of fiscal 2012, the Company repurchased 2.5 million shares of the Company's stock under the Share Repurchase Program, spending a total of $99 million."  (Id. ¶ 105.)

Plaintiffs allege no facts, however, to show any link between the Company's repurchases and the trades at issue.  Plaintiffs merely speculate that "the Share Repurchase Program **may** have constituted a waste of corporate assets" or that the repurchases were improper "**if**" the directors were selling their shares "at the same time".  (CC ¶¶ 108, 63 (emphases added).)  Such unsupported pleading does not plausibly suggest that the Company was harmed as a result of Defendants' alleged conduct.  Accordingly, because Plaintiffs do not sufficiently allege harm to the Company, Plaintiffs fail to state a claim.[8]

### 3.    Plaintiffs Fail to Allege Facts Plausibly Suggesting that the Individual Defendants' Trades Were Based on Material, Nonpublic Information.

Even if this Court were to create an Ohio fiduciary duty cause of action for insider trading or were to find that Big Lots had been harmed as a corporation, Plaintiffs' allegations

---

[8] This application of Ohio law is consistent with the law of other jurisdictions to address the issue.  States that, like Ohio, require plaintiffs in derivative actions to allege harm to the corporation agree that allegations of insider trading do not state a derivative claim. See Freeman, 584 F.2d at 194 (Indiana law); In re Cray, 431 F. Supp. 2d at 1132–33 (Washington law); Schein v. Chasen, 313 So.2d 739, 746 (Fl. 1975) (Florida law); Daisy Sys. Corp., v. Finegold, No. C 86–20719(SW), 1988 WL 166235, at *5 (N.D. Cal. Sept. 19, 1988) (California law).  By contrast, jurisdictions that recognize a derivative claim for insider trading are those that, unlike Ohio, do not require plaintiffs to allege harm to the corporation.  See Brophy v. Cities Serv. Co., 70 A.2d 5, 8 (Del. Ch. 1949) (Delaware law); Diamond v. Oreamuno, 248 N.E.2d 910, 912 (N.Y. 1969) (New York law); In re Coleco Sec. Litig., 591 F. Supp. 1488, 1494–95 (S.D.N.Y. 1984) (Connecticut law).  But see In re ORFA Sec. Litig., 654 F. Supp. 1449, 1457 (D.N.J. 1987) (holding in a factually distinguishable case that the plaintiff stated an insider trading claim under New Jersey law because the plaintiff alleged "an ongoing fraud from September of 1983 to January of 1986, based on nondisclosure by corporate directors" and insider stocktrading at the end of that period).  Even Delaware's cause of action has been criticized as obsolete and unnecessary in light of modern federal laws prohibiting insider trading.  See, e.g., In re Cray, 431 F. Supp. 2d at 1132–33.

still do not support a plausible inference that the Individual Defendants' trades were motivated by material, nonpublic information. See In re Oracle Corp. Deriv. Litig., 867 A.2d 904, 934 (Del. Ch. 2004). In the absence of such a showing, Plaintiffs' claims fail.

Because Ohio law does not recognize a breach of fiduciary claim based on insider trading, this Court would need to create one by selecting and applying the law of a different jurisdiction, such as Delaware. See, e.g., In re Goodyear, 2007 WL 43557, at *8 (holding that "[e]ven if the Court were to recognize a new cause of action under Ohio law for insider trading", the plaintiffs' allegations would nonetheless fail under Delaware law). But even under Delaware law, Plaintiffs' allegations would still not state a claim. Under Delaware law, Plaintiffs must show that (1) at the time of their trades, each Individual Defendant knew nonpublic information about the Company's financial performance compared to the announced guidance; (2) the nonpublic information made "it likely that [the company at issue would] either outperform or underperform its projections in some markedly unexpected manner"; and (3) each Individual Defendant's trades were "motivated" by knowledge of the material, nonpublic information. See Oracle, 867 A.2d at 934, 939–40.[9] Plaintiffs' allegations fail to satisfy each of those elements.

First, Plaintiffs have not adequately alleged that the Individual Defendants had nonpublic knowledge of Big Lots' actual mid-quarter financial performance at the time of their trades. The Consolidated Complaint contains no plausible allegation suggesting when, how or from whom the Individual Defendants supposedly received information indicating that Big Lots

_____

[9] These elements mirror the showing necessary to recover against an insider under federal securities law. See In re Oracle, 867 A.2d at 933–34; Guttman v. Huang, 823 A.2d 492, 505 (Del. Ch. 2003). In particular, under Delaware law, a showing that inside trades were unusual in timing or amount might suggest that the trades were motivated by inside information, see In re Oracle, 867 A.2d at 939, 954, while under federal securities law, insider trades must be "unusual in timing or amount" before such trades can suggest wrongdoing, see, e.g., Konkol v. Diebold, Inc., 590 F.3d 390, 399–400 (6th Cir. 2009).

would not meet its first quarter guidance.  Plaintiffs' generalized and conclusory allegation that the Individual Defendants knew about Big Lots' performance because they "had access to and received sales reports and other internal documents" (CC ¶ 57) is insufficient.  See Konkol, 590 F.3d at 397 (rejecting plaintiffs' "[g]eneralized facts alleging that the Defendants had access to [the company's] financial information" as insufficient to show knowledge that a public statement about the company was materially false or misleading).  Plaintiffs speculate that "Defendants also engaged in discussions with other directors, officers and employees to find out [the alleged material nonpublic] information".  (CC ¶ 59.)  But again, Plaintiffs fail to plead any details regarding the timing or circumstances of these alleged conversations, such as the persons involved or the date, place or content of any purported discussion.  That is insufficient.

Second, Plaintiffs have not adequately pleaded that, at the time of their trades, any Individual Defendant knew that any difference between Big Lots' first quarter guidance and its actual performance was material, let alone that any such difference was "markedly unexpected". Oracle, 867 A.2d at 939–40 (stating that market participants are well aware that, in the ordinary course, interim results often deviate from original projections, and consequently nonpublic information is material "only when the intraquarter information makes it likely that the company will either outperform or underperform its projections in some markedly unexpected manner"). Rather, Plaintiffs allege only that, when the Individual Defendants sold their shares, they knew the guidance was "overstated" (CC ¶ 56), but there is no allegation whatsoever regarding what that means, or regarding any knowledge of the magnitude of any difference between the guidance and the Company's actual interim performance.  Indeed, for the trades that occurred in the first week of March—only a few days after the guidance was issued and the time period when most of the directors traded their shares—Plaintiffs' allegations are especially implausible,

10

as the Consolidated Complaint says nothing to suggest the March 2 guidance—which Plaintiffs

do not allege was incorrect when issued—had somehow become markedly unreliable in just a

few days or that the Individual Defendants were aware of such fact.[10]

          <u>Third</u>, Plaintiffs have not demonstrated that any Individual Defendant's stock

trades were actually motivated by any purported knowledge of material, nonpublic

information—Plaintiffs allege only that the timing and amount of the trades themselves were

"suspicious".  (CC ¶ 55.)  Beyond that, the full context of the Individual Defendants' stock sales

directly contradicts Plaintiffs' conclusory allegation.  <u>See</u> <u>Oracle</u>, 867 A.2d at 934, 954 (holding

that neither timing nor amount of trades "create[d] any rational inference of scienter" because

they could be explained by "proper, non-suspicious financial considerations").  For example,

Plaintiffs have not demonstrated that the Individual Defendants' stock sales were unusual in

timing.  On March 1, the day <u>before</u> the public statements at issue in this litigation, and again on

March 6, when Defendants began selling their shares, Big Lots shares closed at a 14-year high,[11]

making Defendants' decisions to sell some of their holdings shortly thereafter both prudent and

entirely understandable.  <u>See</u> <u>Sawant v. Ramsey</u>, 742 F. Supp. 2d 219, 232 (D. Conn. 2010)

(finding no insider trading because, among other reasons, the defendant "sold at a time when

Host's stock had reached unprecedented levels in both price and trading volume, thus enabling

---

[10] In particular, Plaintiffs allege no facts supporting an inference that any reasonable investor or Big Lots executive would place special weight on the Company's performance in the middle of March.  <u>See</u> <u>Oracle</u>, 867 A.2d at 940.  Although Plaintiffs allege Big Lots sells "seasonal products" (CC ¶ 9), the trades at issue occurred in early and mid-March, before the late March and April timeframe when the Easter holiday and the changing weather affect sales of seasonal products.  <u>See</u> <u>Oracle</u>, 867 A.2d at 942–43 (finding no basis to infer that "anyone involved at high levels in examining Oracle's ability to make its quarterly estimates placed substantial weight on first month performance within quarters").

[11] <u>See</u> DeMay Decl. Ex. B.

him to secure a substantial return on his initial investment. There was nothing uncharacteristic or risky concerning his sale under these circumstances.").  Similarly, on March 6, 2012, eight of the Officer Defendants each received new awards of tens of thousands of Big Lots shares.[12]  That sudden increase in holdings explains the timing of their sales, which all occurred shortly thereafter and in some instances the very next day, and dispels any inference that Plaintiffs seek to create based on their conclusory allegations.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) (rejecting an inference of scienter based on sales of options because options "were an intended part of [defendants'] overall compensation package").

Nor have Plaintiffs demonstrated that the sales were unusually large in a manner that suggests the trades were motivated by an improper purpose.  See Konkol, 590 F.3d at 399. Plaintiffs make the conclusory allegation that, because certain Defendants sold supposedly large percentages of their Big Lots holdings, those trades are suspicious.  (CC ¶¶ 33–48.)  That allegation rings hollow, however, because the Individual Defendants routinely receive new Big Lots stock or options as a regular part of their compensation, and the new stock or options therefore effectively "replenish" in the ordinary course any shares that are sold.[13]  In a classic example of this phenomenon, on March 6, 2012, Mr. Schroeder was awarded 15,000 stock option units and 2,000 shares of Big Lots stock, yet he sold only 11,000 shares (73% of his Big

---

[12] See Forms 4 for Defendants Claxton, Cooper, Haubiel, Johnson, Martin, Schroeder, Segal and Smart (DeMay Decl. Exs. D–K, respectively).  It is well-established that Forms 4 are properly considered on a motion to dismiss, both because they are judicially noticeable and because they are "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit".  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); see In re CNET Networks, Inc., 483 F. Supp. 2d 947 (N.D. Cal. 2007).

[13] See Forms 4 for Defendants Claxton, Cooper, Haubiel, Johnson, Martin, Schroeder, Segal, Smart, Mallott, Tishkoff, Solt, Kollat, Rankin, Berger, Lauderback and Fishman (DeMay Decl. Exs. D–S, respectively).

Lots holdings, not including the new awards) between March 2 and April 23, meaning his Big Lots holdings actually increased.[14]  See In re Goodyear, 2007 WL 43557, at *8 (finding that the plaintiffs failed to state a claim for insider trading where the defendant "actually increased his Goodyear stock holdings during the relevant period").  Although not every Individual Defendant's holdings increased during the specific March–April 2012 window, Plaintiffs' omission of the context of the Individual Defendants' stock holdings mischaracterizes the overall significance of the March 2012 sales.

Similarly, Plaintiffs fail to show that the proceeds of the trades were intrinsically large enough to serve as a motivation to engage in insider trading.  See Oracle, 867 A.2d at 934. Plaintiffs allege no facts to support their conclusory and speculative allegation that the proceeds of the stock sales were "material as to each director".  (CC ¶ 83.)  In fact, while Plaintiffs allege the Individual Defendants each received certain proceeds from their sales (CC ¶ 50), those alleged amounts are grossly inflated.  Properly computed, they do not remotely suggest insider trading.  Plaintiffs calculated the alleged "proceeds" of those sales by multiplying the number of shares sold by the sale price.  (Id.)  But those "proceeds" are gross, not net.  Once the cost basis is taken into account, the totals listed in the Consolidated Complaint are demonstrably misleading and inflated.[15]  The corrected amounts, which for some Defendants are under

---

[14] See Schroeder Forms 4 (DeMay Decl. Ex. I).

[15] For example, Plaintiffs allege that Defendant Dennis Tishkoff sold 4,000 shares at $44.62 for proceeds of $178,480 (CC ¶ 50), but those shares were options exercised that day at $28.22. See Tishkoff Form 4 dated March 8, 2012 (DeMay Decl. Ex. M).  Accordingly, Mr. Tishkoff's proceeds were only $65,600, not $178,480.  (That $65,600 total is itself overstated because it represents pre-tax earnings.)  Analyzing this issue using Plaintiffs' own theory of the case reduces the amount of Mr. Tishkoff's proceeds even further: the true proceeds from the alleged insider trading would be the difference between the profit actually earned on the sale and the profit that would have been earned had the sale been made after the information was made public

$100,000, do not automatically raise a plausible inference that the Individual Defendants committed insider trading. See, e.g., Rothman, 220 F.3d at 95 (dismissing securities fraud claim where defendant director sold $20 million in stock).

Plaintiffs fail to, and cannot, allege facts that would plausibly satisfy each element of a newly created insider trading claim, and therefore Plaintiffs' claims should be dismissed.

**B.      Plaintiffs Have Failed to Demonstrate that Demand Would Have Been Futile Because They Fail to Plead Particularized Facts Showing that a Majority of Big Lots Directors Faces a Substantial Likelihood of Liability for Insider Trading or Is Otherwise Incapable of Exercising Business Judgment.**

Even if Plaintiffs could state a plausible claim for relief—which they cannot—this derivative action against the Individual Defendants should nonetheless be dismissed for a separate, important reason: as a matter of fundamental corporate law, Plaintiffs are not entitled to bring this lawsuit in the first place. Because this lawsuit purports to remedy a supposed harm to the corporation itself, Plaintiffs bring this action derivatively, stepping into the Company's shoes. But under Ohio corporate law, the decision to bring litigation can only be made by a corporation's board of directors. Drage v. Proctor & Gamble, 694 N.E. 2d 479, 482 (Ohio Ct. App. 1997).[16] Were it otherwise, any disgruntled shareholder could file derivative actions in order to "remedy" any number of perceived slights to the company, regardless of the overall corporate perspective. At any time, shareholders may submit a formal demand to the board members, urging them to bring a lawsuit, but if the board declines to do so—or if the shareholder never makes the demand in the first place—the shareholder may not simply 'go over the board's

---

on April 23, 2012, when Big Lots' share price fell to $34.71. Under that approach, Mr. Tishkoff's proceeds would be $39,640. (4,000 shares x ($44.62 - $34.71) = $39,640.)

[16] Ohio law governs demand futility in this litigation because the law of the state of incorporation applies, Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991), and Big Lots is incorporated in Ohio (CC ¶ 9).

head' and initiate litigation anyway. Only in limited circumstances may the shareholder ignore the demand requirement. See id.; Fed. R. Civ. P. 23.1. Those circumstances are not present here, and Plaintiffs have failed to justify their attempt to oust the Big Lots board from its responsibility to make decisions for the Company.

As noted in In re Keithley Instr., Inc., Deriv. Litig. (Keithley II), 599 F. Supp. 2d 908 (N.D. Ohio 2009), the Rule 23.1 requirement that derivative plaintiffs first seek to obtain the desired action from the board "is not a procedural technicality. 'Rather, it serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies.'" 599 F. Supp. 2d at 918 (quoting Grand Council of Ohio v. Owens, 620 N.E.2d 234 (Ohio Ct. App. 1993)). Before a shareholder may sue on behalf of a corporation, the shareholder must either demand that the board bring the lawsuit or show that such a demand would be futile. Drage, 694 N.E.2d at 482–83. Demand is futile if a majority of directors "cannot properly exercise their business judgment in determining whether the suit should be filed". Id. The burden of showing futility falls on the plaintiff. In re Ferro Corp. Deriv. Litig., 511 F.3d 611, 618 (6th Cir. 2008).

"Establishing demand futility under Ohio law is not an easy task." Keithley II, 599 F. Supp. 2d at 918 (quotation marks omitted). To excuse demand as futile, Plaintiffs must allege particularized facts that "overcome the presumption that the board of directors can make an unbiased, independent business decision about whether it would be in the corporation's best interests to bring a lawsuit." Id. at 919; see Drage, 694 N.E.2d at 482–83; accord Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).

Courts have "consistently rejected the idea that demand is always futile when the directors are targeted as the wrongdoers in [a derivative] suit" or because "directors would not

15

want to sue themselves or each other". In re Ferro Corp., 511 F.3d at 618, 619, 622. Instead, demand is futile only if "the particularized allegations in the complaint present a 'substantial likelihood of liability'". Keithley II, 599 F. Supp. 2d at 919–20 (emphases added). In the specific context of an insider trading claim, this principle means it is not enough simply to allege the defendants traded in company stock when they might have possessed material, nonpublic information; instead, the allegations must contain additional, particularized facts that give rise to a substantial threat of liability. Guttman v. Huang, 823 A.2d 492, 502–04 (Del. Ch. 2003). As detailed below, Plaintiffs' allegations do not come close to satisfying that pleading standard.

### 1. The Directors' Board Activities Do Not Establish that They Cannot Exercise Business Judgment.

Plaintiffs allege that past decisions made by the Big Lots Board demonstrate that the directors are incapable of exercising independent business judgment as a general matter. (CC ¶¶ 74–79.) Those allegations, however, amount to nothing more than Plaintiffs' second-guessing of the Board's decisions, and as a matter of law they are insufficient to show demand futility.

Plaintiffs first allege the outside directors are incapable of deciding whether to bring a lawsuit because they have a "tendency to indulge senior executives in lavish compensation packages that are disconnected from the Company's financial performance." (CC ¶ 74.) Plaintiffs allege no particularized facts regarding the supposed excessive compensation or any connection between setting compensation and the directors' good-faith ability to determine whether to bring a lawsuit on behalf of the corporation. In any event, it is well-settled that allegedly excessive compensation for management does not establish that the board members are not independent. Aronson, 473 A.2d at 817.

Plaintiffs then allege that several directors are not independent because they serve on various committees whose decisions Plaintiffs view as unsatisfactory, but the law is clear that

allegations of futility based such theories do not satisfy Rule 23.1.  See In re Goodyear, 2007 WL 43557, at *5 (stating that "highly generalized" allegations that defendant directors were members of various standing committees as evidence of alleged wrongdoing provided "no specific facts indicating a nexus between any individual committee member and any inappropriate action or failure to act").  Accordingly, Plaintiffs' vague and conclusory allegations that (a) the compensation committee on which Mr. Tishkoff and Mr. Solt serve approved excessive executive compensation (CC ¶¶ 76–77); (b) Big Lots failed to appoint a director to serve as the chair of the nominating and corporate governance committees on which Ms. Lauderback serves (id. ¶ 78); and (c) Mr. Kollat "failed to advance independence while he served as chairman of the nominating and corporate governance committee, causing Glass Lewis to urge shareholders to withhold votes for him at the 2011 annual meeting" and that he "exhibited propensity to advance the interests of the Company's executives and incumbent directors" (id. ¶ 79) do not show that the directors cannot exercise business judgment.  See In re Goodyear, 2007 WL 43557, at *5; In re Ferro Corp., 511 F.3d at 619 (stating that a "bare allegation that the directors would not want to sue themselves or each other does not show that demand would be futile").

In addition to alleging that the outside directors are not independent, Plaintiffs allege Mr. Fishman is disqualified as an inside director because (a) he is employed by Big Lots as CEO and "receives out-sized compensation"; (b) the Company's 2012 Proxy states he "is not 'independent'"; (c) he is responsible "for the veracity of the Company's public statements and the legitimacy of his insider sales, as well as his subordinate executives"; and (d) "he ultimately has 'the most to lose' in the event allegations are further substantiated or an investigation reveals additional executive wrongdoing."  (CC ¶ 84.)  Not only have Plaintiffs confused the "independence" disclaimer based on his insider role with "independence" for demand purposes,

but Plaintiffs' allegations are nothing but an assertion that Mr. Fishman would not want to sue himself or the other Defendants, which is insufficient as a matter of law as a basis for wresting corporate control from the Board of Directors. In re Ferro Corp., 511 F.3d at 619.

> **2.** **Plaintiffs Have Not Shown that a Majority of Directors Faces a Substantial Likelihood of Liability for Breach of Fiduciary Duty Based on Insider Trading.**

Because Plaintiffs have not established the Big Lots directors' lack of independence, Plaintiffs must show that a majority of the directors faces a substantial likelihood of liability in order to bypass the Board. In re Keithley Instruments, Inc., Deriv. Litig. (Keithley I), 599 F. Supp. 2d 878, 895 (N.D. Ohio 2009). At the time the lawsuit was filed, the Board included nine members, seven of whom are named as Defendants. (CC ¶ 81.) Plaintiffs must therefore show that five out of those nine directors face a substantial likelihood of liability. Stated differently, if at least three of the seven Director Defendants do not face a substantial likelihood of liability, then Plaintiffs have failed to establish demand futility.

Just as Plaintiffs' allegations regarding the Individual Defendants' knowledge of material, nonpublic information, as well as the amounts and timing of the trades at issue, fail to state a plausible claim (see supra pp. 8–14), Plaintiffs also fail to allege particularized facts showing a substantial likelihood of liability for any director. See Guttman, 823 A.2d at 504.

As explained above (see supra pp. 9–11), Plaintiffs must first show that the Individual Defendants knew at the time of each of their trades that the Company would fall materially short of its guidance. In the context of demand futility, to establish that the directors knew such information, Plaintiffs "must plead particularized facts 'detailing the precise roles that these directors played at the company [and] the information that would have come to their

18

attention in these roles'". Keithley I, 599 F. Supp. 2d at 895 (quoting Guttman, 823 A.2d at

503); Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *10 (Del. Ch. 2003).

Plaintiffs do not allege any particularized facts demonstrating that any of the

outside directors received any specific information at the time of his or her trades regarding

whether the Company would meet its guidance, such as, for example: (a) whether any outside

director had any significant role in monitoring sales at Big Lots; (b) whether any outside director

received periodic information regarding daily or weekly sales compared to the Company's

projections; or (c) facts about how outside directors customarily received such information. See

Guttman, 823 A.2d at 496–98, 503–04. In Guttman, various directors of NVIDIA allegedly

traded on inside information regarding accounting improprieties at the company. The complaint

alleged that "[e]ach of the defendants was in a position to know of the improper accounting

practices engaged in by NVIDIA during the Contested Period." Id. at 496–97. The complaint,

however, was "entirely devoid of particularized allegations of fact demonstrating that the outside

directors had actual or constructive notice of the [material nonpublic information]. . . .

Relatedly, the complaint is devoid of any pleading regarding the full board's involvement in the

preparation and approval of the company's financial statements." Id. at 498. The court

dismissed the complaint for failure to show futility because "[n]othing in the complaint provides

any particularized basis to infer that these outside directors had any idea about the questionable

accounting practices." Id. at 504.

The same is true here: Plaintiffs allege cursorily that the Individual Defendants

had access to internal documents by virtue of their positions, but Plaintiffs do not allege any

specific facts showing that the Individual Defendants knew before their trades that Big Lots

would not meet its guidance. Plaintiffs certainly do not allege that any outside director, at the

19

time of his or her trades (which took place as early as two business days after the guidance was issued), knew credible information that Big Lots would "underperform its projections in some markedly unexpected manner". Oracle, 867 A.2d at 940.

Plaintiffs cannot overcome that failure to show that any outside director had such knowledge at the time of their trades by alleging conclusorily (see CC ¶ 52) that the Director Defendants sold unusually large percentages of their Big Lots holdings. See Guttman, 823 A.2d at 505. In Guttman, the court held that two directors did not face a significant likelihood of liability, even though they sold 100% and 50% of their shares in the defendant company, because there was no suggestion that they knew material, nonpublic information at the time of their trades. Id. at 504–05. Here, four of seven Director Defendants sold fewer than 50% of their Big Lots shares, and no Director Defendant sold more than 75%. (CC ¶¶ 33–48.)

Plaintiffs allege in conclusory fashion that the Director Defendants' trades "did not follow any of [their] historical patterns of sales" (CC ¶ 52), but Plaintiffs grossly mischaracterize each of the their trading histories by omitting crucial facts. See Konkol, 590 F.3d at 399 (stating that plaintiffs must provide a "meaningful trading history for purposes of comparison to the stock sales within the class period"); see also Guttman, 823 A.2d at 504 (criticizing allegations of unusual trading patterns that are based on "a temporally brief period"). Here, the directors' full trading histories (detailed below) show that the trades at issue are frequently smaller than previous trades and are in line with the timing of previous trades.

Plaintiffs also allege in conclusory fashion that the Director Defendants' trades were unusual in timing because they came in the four weeks following the issuance of the Company's first quarter guidance (CC ¶ 52), but "[n]o inference can be drawn from that simple fact because it is more obviously consistent with the idea that [the Company] permitted stock

sales in such periods because it diminished the possibility that insiders could exploit outside market buyers."  Guttman, 823 A.2d at 503–04.

**(a)**    **Plaintiffs Fail to Show that Outside Directors Philip Mallott, Dennis Tishkoff and Russell Solt Face a Substantial Likelihood of Liability.**

Plaintiffs allege that outside directors Philip Mallott, Dennis Tishkoff and Russell Solt face a substantial likelihood of liability (see CC ¶ 81), but the facts show the opposite:

| Outside director | Number of shares sold | Number of business days after stock price reaches 14-year high | Number of business days after guidance announced | Proceeds alleged in the Consolidated Complaint | Net proceeds after accounting for cost basis, but before taxes |
|---|---|---|---|---|---|
| Philip Mallott (CC ¶ 48) | 1,500 | 6 | 5 | $68,000 | ≤$68,000[17] |
| Dennis Tishkoff (CC ¶ 46) | 4,000 | 4 | 3 | $178,000 | $66,000[18] |
| Russell Solt (CC ¶ 44) | 6,425 | 3 | 2 | $280,000 | $167,000[19] |

Plaintiffs allege no facts to support their conclusory allegation (CC ¶ 83) that the post-tax proceeds from any director's sales are "material" in the context of each director's specific financial situation.  (See supra, p. 13.)  Nor can the percentages at issue—11%, 22% and 42% of the Big Lots holdings of Messrs. Mallott, Tishkoff and Solt, respectively—overcome Plaintiffs' failure to plead any particularized facts showing that the directors knew at the time of their trades that Big Lots would fail to meet its guidance.  See Guttman, 823 A.2d at 504–05.

---

[17] The Form 4 for this transaction does not specify a cost basis for these shares, but if the cost basis was greater than zero, then the net proceeds would be less than the gross.  See Mallott Form 4 dated March 13, 2012 (DeMay Decl. L).

[18] See Tishkoff Form 4 dated March 8, 2012 (DeMay Decl. Ex. M).

[19] See Solt Form 4 dated March 8, 2012 (DeMay Decl. Ex. N).

The bare allegation that Mr. Mallott's previous sale of Big Lots stock occurred exactly two years earlier, in March 2010, does not establish an unusual trading pattern.  What Plaintiffs conveniently fail to state in the Consolidated Complaint is that Mr. Mallott's two sales in March 2010 totaled 14,500 shares—nearly <u>ten times</u> the amount he traded here—and Mr. Mallott's next-previous trades were two years before that, in June 2008, when he sold 10,000 shares.[20]  Thus Mr. Mallott's March 2012 trade (which came at a 14-year high) was consistent with selling shares every two years, and the 1,500 shares involved made it the <u>smallest</u> sale of Big Lots stock he had ever executed since becoming a director.

Similarly, Plaintiffs' allegation that Mr. Tishkoff's previous sale of Big Lots stock occurred exactly two years earlier, in March 2010, omits crucial details of his trading history.  The March 2010 trades were for 20,000 shares—<u>five times</u> the amount he traded here—and Mr. Tishkoff's next-previous trades took place two years before that, in June 2008, when he sold 41,000 shares, and November 2006, when he sold 15,000 shares.[21]  This full trading pattern shows that his trade came at a 14-year high, was consistent with selling shares every two years, and the 4,000 shares at issue made it the <u>smallest</u> Big Lots sale he had ever executed since becoming a director.

Finally, Mr. Solt's previous sale of Big Lots stock (in June 2010) was for 18,000 shares—almost <u>three times</u> the amount traded here—and Mr. Solt's next-previous trades were in

---

[20] <u>See</u> Mallott Forms 4 (DeMay Decl. Ex. L).  The June 2008 sale was his first-ever sale of Big Lots stock since becoming a director.  <u>Id.</u>  In March 2010, Mr. Mallott sold 5,000 shares in one transaction and 9,500 shares in a separate transaction earlier that month.  <u>Id.</u>

[21] <u>See</u> Tishkoff Forms 4 (DeMay Decl. Ex. M).  The November 2006 sale was his first-ever sale of Big Lots stock since becoming a director.  <u>Id.</u>

December 2009 (16,000 shares), and March 2007 (14,000 shares).[22]  Mr. Solt's March 2012

trade came at a 14-year high, was consistent with selling shares roughly every two years and, at

6,425 shares, was the <u>smallest</u> Big Lots trade he had executed since becoming a director.

        In short, Plaintiffs fail to allege particularized facts showing that at least the above

three directors face a substantial likelihood of liability for insider trading and are "interested" for

the purpose of considering a shareholder demand.  As a result, a majority of the nine Big Lots

directors—Messrs. Mallott, Tishkoff and Solt, plus the two Big Lots directors not named as

defendants (and about whom no facts are pled at all)—are <u>not</u> interested, and therefore Plaintiffs

fail to show that demand would have been futile.  The Court may dismiss the Consolidated

Complaint for that reason alone, and there is no need for the Court to consider whether any of the

other directors is interested for demand futility purposes.

        **(b)**    **Plaintiffs Fail to Show that the Remaining Outside Directors
Face a Substantial Likelihood of Liability.**

        Even if the Court were to assess Plaintiffs' demand futility allegations concerning

the remaining directors, those allegations would fail.  Not only do Plaintiffs fail to show that the

remaining directors knew at the time of their trades that Big Lots would miss its guidance in a

markedly unexpected way, Plaintiffs also fail to allege particularized facts showing that the

trades were unusual in timing or amount.

        For example, although Plaintiffs suggest that Mr. Kollat's March 6, 2012, sale of

70% of his Big Lots holdings was unusual (<u>see</u> CC ¶ 35), Plaintiffs acknowledge that he retired

from the Board shortly thereafter (<u>see</u> <u>id.</u> ¶ 79), and it certainly is not uncommon for directors to

sell large portions of their holdings before retiring.  <u>See</u> <u>In re K-tel Int'l, Inc. Sec. Litig.</u>, 300

---

    [22] <u>See</u> Solt Forms 4 (DeMay Decl. Ex. N).  The March 2007 sale was his first-ever sale of
Big Lots stock since becoming a director.  <u>Id.</u>

F.3d 881, 896 (8th Cir. 2002) (holding that a company president's sales of 390,000 shares in May 1998 "should not materially impact the scienter analysis because he resigned as company president in August 1998").  Similarly, Plaintiffs insinuate Mr. Berger's trade was suspicious because it was his first-ever sale of Big Lots stock (CC ¶ 38), but Mr. Berger had served only six years on the Board, and the far more plausible explanation for his trade is that he sold shares while the Company's stock price was trading at a record high.  And in the case of Ms. Lauderback, Plaintiffs again present an incomplete and misleading trading history by mentioning only one previous trade (in June 2011) while ignoring (a) her trades in January and April 2010 totaling 20,000 shares; (b) her trades in June 2008 totaling 10,000 shares and (c) her trades in summer 2007 totaling 15,000 shares.[23]  See Guttman, 823 A.2d at 504 (criticizing allegations of unusual trading patterns that are based on only one year of trading history).[24]

In sum, Plaintiffs have not pled particularized facts showing that any of Big Lots' six outside directors faces a substantial likelihood of liability that would demonstrate that demand on the Board would have been futile.

> **(c)** **Plaintiffs Fail to Allege Particularized Facts Showing that Steven Fishman Faces a Substantial Likelihood of Liability.**

As with the other directors, Plaintiffs do not allege any particularized facts showing that Mr. Fishman had received any specific information at the time of his trade regarding whether the Company would meet its guidance.  (See supra pp. 9–11.)  Plaintiffs allege

---

[23] See Lauderback Forms 4 (DeMay Decl. Ex. R).

[24] As with the other directors, Plaintiffs allege "proceeds" calculated without using the correct cost basis.  For example, Mr. Berger's net proceeds were $430,000 (not $900,000) before taxes (see Berger Form 4 dated March 13, 2012 (DeMay Decl. Ex. Q)), and Ms. Lauderback's proceeds were $668,000 (not $1.32 million) before taxes (see Lauderback Form 4, dated March 8, 2012 (DeMay Decl. Ex. R)).

only that Mr. Fishman, as CEO, "would necessarily be privy to the Company's actual financial performance" (CC ¶ 58), but allegations based on a defendant's position are insufficient. Guttman, 823 A.2d at 494, 498. For example, the court in Guttman held that, even for the company's CEO, the "complaint lacks particularized allegations regarding his involvement in the process of preparing the company's financial statements." Id.

Plaintiffs' allegations do not establish that the amount or timing of Mr. Fishman's trades was unusual. Mr. Fishman's sale of 106,125 shares on March 27, 2012, was made pursuant to a 10b5-1 plan and was identical to a sale of 106,125 shares one year earlier, on March 31, 2011.[25] Moreover, his sale of 227,500 shares came just two weeks after he was awarded 240,000 shares of Big Lots stock and one year after he was awarded 250,000 shares (id.), and there is nothing suspicious about claiming the compensation to which he is entitled, particularly when Big Lots shares were trading at a 14-year high. See Advanta, 180 F.3d at 541; In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425, 471 (D.N.J. 2000). Even the dollar amount of his net proceeds—$9.9 million before taxes, not $15.2 million[26]—while not trivial by any means, is certainly not inherently suspicious, as Plaintiffs contend. See, e.g., Rothman, 220 F.3d at 95 (dismissing securities fraud claim where director sold $20 million in stock).

In sum, Plaintiffs do not and cannot show—with particularized facts as opposed to vague speculation and misleading characterizations—that the directors knew at the time of their trades that Big Lots would miss its guidance in an unexpected way; that the directors' actual, net proceeds were material; that the amounts of the directors' trades exceeded the amounts of previous trades; or that the timing of the directors' trades was not explained by

---

[25] See Fishman Forms 4 (DeMay Decl. Ex. S).

[26] See Fishman Forms 4 dated March 21, 2012 and March 29, 2012 (DeMay Decl. Ex. S).

innocuous (and obvious) factors.  Plaintiffs therefore fail to show that the directors face a

substantial likelihood of liability.  And Plaintiffs have not shown that the directors cannot

otherwise exercise their business judgment in deciding whether to sue on behalf of the Company.

Accordingly, Plaintiffs have not shown that demand on the Board would have been futile, and

therefore the Consolidated Complaint must be dismissed under Rule 23.1.

Dismissal should be with prejudice.  See Shlensky v. Dorsey, 574 F.2d 131, 142

(3d Cir. 1978).  The Consolidated Complaint is the fourth complaint in this action, and Plaintiffs

have already had ample opportunity to conduct a proper investigation and attempt to allege

particularized facts showing futility.

## II.    PLAINTIFFS' ALLEGATIONS OF VIOLATIONS OF INTERNAL CODES OF CONDUCT FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE.

In their second cause of action, Plaintiffs allege that the Individual Defendants

breached their fiduciary duties by violating Big Lots' internal codes of conduct.  (CC ¶¶ 90–93.)

But that cause of action does not exist in Ohio law.  To establish a claim for breach of a fiduciary

duty, a plaintiff must plead a legal duty to the corporation, a breach of that duty, and an injury to

the corporation proximately resulting from that breach.  See Davis, 259 F. Supp. 2d at 673;

Brown, 763 F.2d at 803–04.  As far as Defendants are aware, no court has held that (a) a

corporation's internal code of conduct creates a legal fiduciary duty to the corporation under

Ohio law; (b) a violation of a corporation's internal code of conduct is a breach of a fiduciary

duty to the corporation under Ohio law; or (c) a violation of a corporation's internal code of

conduct is sufficient to establish an injury to the corporation under Ohio law.  Again, this Court,

sitting in diversity, should refuse to create new Ohio common law.  See 19 Wright & Miller,

Federal Practice and Procedure § 4507 ("Nor is it the function of the federal court to expand the

existing scope of state law.").  Therefore, even assuming that any violation of internal rules

occurred—and it did not—Plaintiffs fail to state a valid claim and also fail to show a substantial

likelihood of liability that would excuse demand on the Board of Directors.

### III.  PLAINTIFFS' ALLEGATIONS OF CORPORATE WASTE FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE.

Under Ohio law, a corporate officer or director has a fiduciary duty not to waste

corporate funds.  In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 617 F. Supp. 2d 700, 718

(S.D. Ohio 2009).  The doctrine of "corporate waste" expresses a way in which a corporate

director's fiduciary duty can be breached but not a cause of action independent of a fiduciary

breach.  See, e.g., Keithley I, 599 F. Supp. 2d at 903 & n.25.  Defendants are not aware of any

case recognizing a corporate waste claim under Ohio law based on either share repurchases or

insider trading.  Moreover, under Ohio law, Plaintiffs must allege an injury resulting proximately

from the alleged breach of a fiduciary duty, In re Nat'l Century, 617 F. Supp. 2d at 717, but as

discussed above (see supra pp. 7–8), Plaintiffs have failed to plead any particularized facts

showing a link between the repurchases and the trades at issue.  Unable to rely on the trades,

Plaintiffs' only allegations of wrongdoing are essentially that (a) repurchases possibly occurred

after the March guidance; (b) Big Lots revised its guidance in April; and (c) the stock price

declined after Big Lots revised its guidance.  Those facts, even if true, are an everyday

occurrence in corporate America and like many other unremarkable events do not plausibly

suggest that the Individual Defendants committed corporate waste in failing to interrupt, suspend

or terminate the repurchase program.  See Bell Atl. v. Twombly, 550 U.S. 544, 557 (2007).

In addition, a director may be held liable for a breach of fiduciary duty for an

action that the director takes or fails to take as a director only if the act or failure to act is

"undertaken with deliberate intent to cause injury to the corporation" or "with reckless disregard for the best interest of the corporation".  Ohio Rev. Code Ann. § 1701.59(E); see In re Goodyear, 2007 WL 43557, at *9.  Nowhere do Plaintiffs allege that any failure to prevent the Company from buying back shares from the Individual Defendants was undertaken with deliberate intent or reckless disregard.  Given that total failure to plead, let alone demonstrate, the Individual Defendants' state of mind, the Consolidated Complaint does not state a claim for breach of fiduciary duty based on corporate waste.  See In re Goodyear, 2007 WL 43557, at *10.  As a result, the Individual Defendants do not face a substantial likelihood of liability on that claim, and Plaintiffs have not shown that demand would have been futile.

## IV.  PLAINTIFFS' ALLEGATIONS OF UNJUST ENRICHMENT FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND WOULD HAVE BEEN FUTILE.

Defendants are not aware of any court that has ever held that allegations of insider trading state a cognizable claim for unjust enrichment under Ohio law.  This Court should not be the first.  And for good reason: under Ohio law, "[u]njust enrichment of a person occurs when he or she has and retains money or benefits which in justice and equity belong to another", Univ. Hosps. of Cleveland, Inc. v. Lynch, 772 N.E.2d 105, 117 (Ohio 2002) (quotation marks omitted), but Plaintiffs have not shown that Big Lots, the corporation on behalf of which Plaintiffs purport to bring their claims, improperly conferred any benefit on the Individual Defendants.  As discussed above (see supra pp. 6–7), trading on material, nonpublic information does not unjustly enrich the trader at the expense of the corporation.  See Freeman, 584 F.2d at 193 (doubting that "an insider has been unjustly enriched vis-a-vis the corporation (as compared to other traders in the market) when there is no way that the corporation could have used the information to its own profit").  Nonpublic information about, for example, "a decline in earnings" is not information

that a corporation can use to its own economic advantage.  Id. at 194.  Because the corporation

suffered no harm, the derivative claim for unjust enrichment, like the claim for insider trading,

must fail, and Plaintiffs cannot show that demand would have been futile.

**V.     PLAINTIFFS' ALLEGATIONS OF TRADE SECRET MISAPPROPRIATION
        FAIL TO STATE A CLAIM AND FAIL TO DEMONSTRATE THAT DEMAND
        WOULD HAVE BEEN FUTILE.**

As discussed above (see supra pp. 6–8), because Plaintiffs purport to bring this

claim derivatively on behalf of Big Lots, they must show that the Company itself was harmed.

But because the alleged misappropriation of trade secrets is the exact same conduct that forms

the basis for the insider trading claims, Plaintiffs cannot show harm to the Company for the same

reasons discussed earlier.  Plaintiffs' trade secret claim should be dismissed on that ground alone.

In any event, as with each of Plaintiffs' other novel and unprecedented claims,

Defendants are not aware of any court that has ever held that allegations of insider trading state a

cognizable claim for trade secret misappropriation under Ohio law.  Accordingly, Plaintiffs'

allegations do not state a claim, and the Individual Defendants do not face a substantial

likelihood of liability on that claim.

**VI.    PLAINTIFFS' TRADE SECRETS CLAIM PREEMPTS THE OTHER CLAIMS.**

The Ohio Uniform Trade Secrets Act (OUTSA) "displace[s] conflicting tort,

restitutionary, and other laws of [Ohio] providing civil remedies for misappropriation of a trade

secret."  Ohio Rev. Code Ann. § 1333.67(A).  Where a common law claim is based on the same

facts as a claim under the OUTSA, courts have found claims such as unjust enrichment and

breach of fiduciary duty preempted.  See, e.g., Columbus Steel Castings Co. v. King Tool Co.,

No. 08AP-385, 2008 WL 5104786, at *3 (Ohio Ct. App. Dec. 4, 2008) (unjust enrichment claim

preempted); Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc., 649 F. Supp. 2d

702, 721–24 (N.D. Ohio 2009) (breach of fiduciary duty claim preempted). Consequently, because Plaintiffs' breach of fiduciary duty and unjust enrichment claims relate to the same conduct on which the trade secrets claim is based, those claims are preempted.

## CONCLUSION

For all the foregoing reasons, the Consolidated Complaint should be dismissed with prejudice.

Respectfully submitted,

**VORYS, SATER, SEYMOUR AND PEASE LLP**

    /s/    William D. Kloss, Jr.    , Trial Attorney
William D. Kloss, Jr. (0040854)
John J. Kulewicz (0008376)
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-4807
wdklossjr@vorys.com
jjkulewicz@vorys.com

**CRAVATH, SWAINE & MOORE LLP**
Michael A. Paskin (admitted *pro hac vice*)
Timothy G. Cameron (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
tcameron@cravath.com

*Counsel for the Individual Defendants and Nominal*
*Defendant Big Lots, Inc.*

30

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was filed electronically through the Court's CM/ECF System this 10th day of September, 2012.  Notice of this filing will be send via email to all parties by operation of the Court's electronic filing system.

/s/ William D. Kloss, Jr.
William D. Kloss, Jr. (0040854)